# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

ISADORE GARTRELL, et al.,

Plaintiffs,

v.

JOHN D. ASHCROFT, et al.,

Defendants.

Civil Action 01-01895  (HHK)

**FILED**

FEB 1 9 2002

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

## MEMORANDUM

Plaintiffs represent a class of prisoners from the District of Columbia whose avowed religious beliefs forbid them from cutting their hair or shaving their beards.  They are in the custody of the Federal Bureau of Prisons ("BOP") and are housed in prison facilities run by the Virginia Department of Corrections ("VDOC").  Plaintiffs allege that BOP's decision to house them in VDOC prisons rather than in BOP prisons violates the Religious Freedom Restoration Act ("RFRA")[1] and the Free Exercise Clause of the First Amendment[2] because VDOC imposes a grooming policy that requires prisoners to shave their beards and keep their hair short.  Plaintiffs seek declaratory and injunctive relief to prevent BOP from subjecting them to the grooming policy.

This case is a continuation of litigation brought against the District of Columbia in December, 1999, during which BOP intervened as a party defendant. At that time, plaintiffs made two basic claims. "First, they contended that VDOC lacked a compelling interest in the

---

[1]     42 U.S.C. §§ 2000bb to 2000bb-4.

[2]     U.S. Const. amend. 1.

grooming policy and that the policy was not the least restrictive means of achieving whatever

interests VDOC had. Alternatively, they argued that BOP and the District had a less restrictive

means of housing prisoners who believed that the grooming policy required them to violate

fundamental religious tenets: transferring them to non-Virginia prison facilities without such

grooming policies." [3]  This court resolved the case by entering a judgment in favor of the

defendants, holding that plaintiffs had failed to exhaust their administrative remedies as required

by the Prison Litigation Reform Act. (PLRA). [4]  This court also addressed and rejected plaintiffs'

claim that VDOC's grooming policy violated RFRA and the First Amendment's Free Exercise

clause. [5]  On appeal, the D.C. Circuit affirmed this court's judgment, agreeing that plaintiffs had

failed to exhaust their administrative remedies, but vacated the portion of this court's decision

regarding the merits of plaintiffs' claims. The D. C. Circuit observed, however,  that this court

had expressly "'decline[d] to evaluate' the issue raised by the prisoners' alternative claim:

'whether defendants have compelling interests in keeping plaintiffs incarcerated in Virginia

Corrections facilities.'"[6] With respect to this claim , the court said, "should the prisoners refile

after exhausting their administrative remedies, the district court will need to consider whether

BOP and the District can demonstrate that alternative placement in non-Virginia prisons without

grooming policies is infeasible."[7]

---

[3]  *Jackson v. District of Columbia*, 254 F.3d 262, 264 (D.C. Cir. 2001)

[4]  42 U.S.C.  § 1997e(a).

[5]  *Jackson v. District of Columbia*, 89 F. Supp. 2d 48 (D.D.C. 2000).

[6]  *Jackson v. District of Columbia*, 254 F.3d 266.

[7]  *Id.* at 271.

After exhausting their administrative remedies, plaintiffs refiled the instant action. Based on the evidence presented at the three-day trial of this case, the court makes the following:

## FINDINGS OF FACT

**I.    BOP'S DECISION TO HOUSE CLASS MEMBERS IN VDOC FACILITIES SUBSTANTIALLY BURDENS THEIR RELIGIOUS BELIEFS AND PRACTICES**

### A.    Plaintiffs Have Sincere Religious Beliefs That Conflict With the VDOC Grooming Policy

1.    The parties have stipulated that "each of the named plaintiffs has sincerely held religious beliefs that prohibit them from shaving or cutting their hair, and that conflict with VDOC's grooming policy." Stipulations of Fact ¶ 3 (filed Oct. 27, 2001). *See also Jackson*, 89 F. Supp. 2d at 65 (finding that "plainitffs have met their burden of showing that [VDOC's] grooming policy substantially burdens their exercise of religion.").

2.    Carl Wolfe, one of the named plaintiffs in this action, is an adherent of the Rastafarian faith. As a part of the practice of his faith, Wolfe has taken the Vow of the Nazarite, based on Numbers 6 of the Bible, that prohibits him from shaving his beard or cutting his hair. It would be a violation of a fundamental tenet of the Rastafarian faith for Wolfe to have his hair cut or his face shaved after he has taken this vow. *See Jackson*, 89 F. Supp. 2d at 65 (finding Wolfe's testimony regarding his faith to be "heartfelt and sincere," and finding that he grows his beard and dreadlocks "because of [his] religious beliefs").

3.    Isadore Gartrell and Darnell Stanley, both named plaintiffs in this action, are adherents of the Sunni Muslim sect of the Islamic religion. Gartrell and Stanley hold sincere beliefs that shaving off their beards violates a fundamental tenet of Islam. *See id.* (finding that

previous named plaintiff who was Sunni Muslim grew his beard "because of [his] religious beliefs").

**B.     VDOC's Grooming Policy Imposes a Substantial Burden Upon Plaintiffs' Religious Beliefs**

4.     A fundamental tenet of the Sunni and other Muslim sects prohibits male followers from shaving their faces. *See Jackson*, 48 F. Supp 2d at 65. Likewise, a fundamental tenet of Rastafarianism prohibits a person from shaving his beard or cutting his hair after he has taken the Vow of the Nazarite. *See Jackson*, 89 F. Supp. 2d at 65.

5.     In November 1999, VDOC adopted Inmate Grooming Standards Procedure No. DOP 864 (the "grooming policy") requiring all inmates in VDOC facilities to wear their hair short, in military-style fashion, and prohibiting all inmates from wearing beards.

6.     The grooming policy requires all BOP inmates housed in VDOC to submit to grooming at regular intervals. The grooming policy also requires all newly admitted BOP inmates from the District to submit to grooming during the VDOC intake process.

7.     An inmate who refuses to comply with the grooming policy is subject to disciplinary reports, administrative segregation (confinement in a cell for 23 hours a day), increases in security and custody level, loss of prison employment, exclusion from programming, and loss of privileges such as visitation, commissary, and telephone. Named plaintiff Wolfe, for example, was held in administrative segregation at Sussex II because he refused to comply with the grooming policy.

8.     VDOC officials do not consider religious objections to be a valid basis for noncompliance with the grooming policy. The VDOC lieutenant overseeing Wolfe's intake at Sussex II told Wolfe that his Rastafarian beliefs regarding shaving his beard and cutting his hair

4

did not matter, and that if he had an objection to the grooming policy, he would have to "take that up in court."

9.      The grooming policy allows VDOC correctional officers to use force and restraints to shave newly admitted inmates during the intake process if the inmates refuse to comply with the grooming policy.  VDOC recently began forcibly shaving inmates who do not voluntarily comply.  Inmates who refuse to comply on religious grounds are restrained, with one guard on each side and three guards positioned near their legs, and shaved by a VDOC official. After the VDOC officials complete the forced shaving, they issue a disciplinary report against the objecting inmate and send him to administrative segregation.

10.      VDOC has repeatedly told Wolfe that if he returns to Sussex II, he will be shaved by force.  On one occasion, as he was being transported from administrative segregation to meet with his counsel, a VDOC official told Wolfe , "'Rasta boy I'm really going to cut that shit off your hair."  Wolfe testified as follows how such a forced shaving would affect him:  "If somebody should hold me down and cut my dre[a]ds and shave my face, that's going to hurt me. That's like taking a part of my soul.  This is my faith.  This is my . . . whole life . . . this is my religion.  This is something where I live by . . . And it will just kill me."

11.      The court finds that subjecting class members to the VDOC grooming policy imposes a substantial burden on the exercise of their religion.  *See Jackson*, 89 F. Supp. 2d at 65.

### C.    BOP Houses its District of Columbia Inmates in Both VDOC and BOP Prison Facilities

12.      In 1997, Congress passed the Revitalization Act, which required the District of Columbia Department of Corrections ("D.C. Corrections") to close its Lorton facility

by December 31, 2001.  The Revitalization Act also required that BOP assume custody of all sentenced felons coming out of District of Columbia courts no later than December 31, 2001.

13.     Pursuant to the Revitalization Act, in October 1999 BOP began to take custody of some District inmates and began transferring them out of D.C. Corrections facilities and into BOP facilities, VDOC facilities, and other contract facilities around the country.

14.     As a result of these custody transfers under the Revitalization Act, some 6,800 District inmates, including the named plaintiffs, are now in the custody of BOP.  A majority of these inmates—approximately 3,600—are housed in BOP facilities located across the United States.  One thousand low security BOP inmates from the District are housed at Rivers Correctional Center, a private contract facility in North Carolina, and some 2,200 District inmates are housed in VDOC facilities.

15.     BOP has intergovernmental agreements with the Commonwealth of Virginia to house District inmates at two facilities in Virginia: Greensville, located in Greensville, Virginia; and Sussex II, located in Waverly, Virginia.  Greensville houses medium security District inmates and Sussex II houses high security District inmates.

16.     BOP executed the agreement with VDOC to house inmates at Greensville on October 1, 1999, and renewed that agreement effective September 6, 2001.

17.     BOP executed the agreement with VDOC to house inmates at Sussex II on July 13, 2001.  BOP's Sussex II contract replaced a similar contract between the District of Columbia and VDOC that expired on that day.

**D.     BOP Does Not Consider Alternatives to Housing Plaintiffs in VDOC Facilities**

18.     Since the filing of the *Jackson* lawsuit in December 1999, BOP has been aware that a number of District inmates at Greensville and Sussex II have religious objections to the VDOC grooming policy.

19.     BOP is also aware of the substantial burdens imposed on its inmates who have religious objections to the grooming policy.  For example, BOP is aware that a number of District inmates at Sussex II are in administrative segregation because they failed to comply with the grooming policy due to religious objections.

20.     BOP admits that denying an inmate access to religious practices because he is in administrative segregation may undermine the inmate's prospects of reintegration and rehabilitation.  Nonetheless, BOP places inmates with religious objections to the grooming policy in administrative segregation in VDOC rather than transferring them to other facilities where they would be able to fully practice their religion.

21.     Sound correctional practice recognizes that inmates who are allowed to practice the fundamental tenets of their religion present less of a management problem than inmates who do not participate in religious activities.  Penological research also indicates that inmates who practice the fundamental tenets of their religion have lower recidivism rates than inmates who do not participate in religious activities.

22.     Despite its knowledge that the VDOC grooming policy imposes a substantial burden upon Muslim and Rastafarian inmates, BOP has refused to consider any alternative to housing the class members in VDOC facilities.

## II.   BOP HAS LESS RESTRICTIVE ALTERNATIVES AVAILABLE FOR HOUSING CLASS MEMBERS

### A.   BOP's Non-VDOC Facilities Provide a Less Restrictive Alternative

23.   BOP has approximately 100 institutions of its own in which it houses inmates. BOP's District prisoners are already housed in almost all of these facilities. In addition, BOP contracts with a number of private facilities to house inmates.

24.   BOP does not impose a grooming policy restricting hair or beard length in its own institutions. *See* 28 C.F.R. §§ 551.2, 551.4. Rather, an inmate may select "the hair style of personal choice, and [BOP] expects personal cleanliness and dress in keeping with standards of good grooming and the security, good order, and discipline of the institution." *Id.* In addition, "an inmate may wear a mustache or beard or both." *Id.*

25.   Across the BOP system, inmate population is in constant flux. Bed space opens every day as thousands of inmates per week are released from custody, or transferred from one institution to another within the same security level or between security levels. In fact, there are more than 50,000 inmate movements in the BOP system each year.

26.   BOP's own institutions, and those of its contractors that do not impose a grooming policy that would burden plaintiffs' religious practices, provide less restrictive alternative placements in which class members could be housed.

### B.   BOP'S Contention That Its Non-VDOC Facilities Are Not Available to House Class Members Is Contrary to the Evidence

At trial, BOP admitted that it has not considered whether there is a less restrictive alternative to housing class members in VDOC institutions. Nonetheless, BOP argued at trial that no less restrictive alternative is available for two reasons: 1) because BOP's non-VDOC facilities are overcrowded; and 2) because it would either be unlawful or impracticable for BOP

to determine whether an inmate has a bona fide religious objection to the VDOC grooming policy. Each of these purported justifications fails to establish that BOP has no less restrictive alternative available to subjecting class members to a grooming policy that substantially burdens their religion.

### 1. *BOP'S contention that its non-VDOC facilities are unavailable because they are overcrowded is unfounded*

27.     BOP currently has custody of approximately 156,000 prisoners. Approximately 50,000 of these inmates are medium or high security. There is a constant flow of prisoners into, out of, and within the system, amounting to more than 50,000 inmate movements in the BOP system each year.

28.     Every BOP-owned facility tracks its "pipeline in" and "pipeline out," showing numbers of inmates scheduled to go to and leave from a particular institution over a 30- or 45-day period. The number of inmates at any given institution is changing constantly because some inmates are departing while others are arriving. For example, there is a high turn-over of BOP inmates in VDOC's Greensville facility.

29.     Throughout the process of taking custody of District inmates pursuant to the Revitalization Act, BOP has placed the majority of District inmates in non-VDOC facilities. Out of the more than 7,000 District offenders BOP has designated over the past several years, approximately 6,800 are still in BOP custody. About 1,000 of these offenders are currently housed at VDOC's Greensville facility, and about 1,240 are housed at VDOC's Sussex II facility. Therefore, only about 2,240 out of BOP's 6,800 District inmates are housed in VDOC facilities. Put another way, BOP has placed about two-thirds of its District inmates in non-VDOC facilities.

30.    BOP's District inmates can be housed in any BOP facility.  BOP currently houses District inmates in virtually every BOP facility, including facilities as far away as California.

31.    For overall capacity purposes, it is irrelevant which District inmates are housed in VDOC facilities and which are housed in BOP facilities.  Because BOP already places the majority of District inmates in non-VDOC facilities regardless of its alleged capacity problems, the crowding at BOP facilities is not relevant to whether BOP has less restrictive placements in non-VDOC facilities available for plaintiffs.  Indeed, BOP has admitted that it could transfer plaintiffs into its own facilities on any given day.  If it did so, it would promptly fill the beds vacated by plaintiffs with other inmates, eliminating any impact of the transfers on overall capacity.

32.    Under the Sussex II contract, BOP contracts for 1,276 beds at VDOC's Sussex II facility.  Because 1,240 BOP inmates are currently housed there, Sussex II is virtually full for BOP's purposes.  Under the Greensville contract, BOP contracts for 1,000 beds at VDOC's Greensville facility.  Greensville, like Sussex II, is virtually full for BOP's purposes.

33.    BOP currently is taking and will continue to take into custody somewhere between 70 and 120 District inmates each month.  Because both Sussex II and Greensville are virtually full for BOP's purposes, the percentage of the overall D.C. inmate population that is housed in non-VDOC facilities will continue to grow as new inmates come into the system.

34.    If BOP inmates are transferred out of Sussex II or Greensville as a result of the court's Order in this case, BOP could and would easily replace those inmates from the population of newly sentenced D.C. inmates.  Therefore, there is no support for defendants' claim

that transfer of class members from VDOC facilities to BOP facilities is infeasible from a capacity standpoint.  To the contrary, transfer of plaintiffs from VDOC facilities to BOP facilities based on their sincere religious objections to VDOC's grooming policy will have no effect on overall capacity.

35.     BOP plans to phase out its use of both Greensville and Sussex II by the end of 2002.  From a capacity standpoint, it makes no difference to BOP which inmates are moved out of these facilities first.

36.     Even if every bed vacated by a class member ordered out of VDOC would not be filled by a new District prisoner, BOP has failed to establish that there are too many class members to be accommodated in its own facilities.  In response to the preliminary injunction this court issued in *Jackson*, BOP implemented a process to determine the number of District inmates at VDOC's Greensville facility who had religious objections to the grooming policy.  BOP found that there were only a handful of inmates with religious objections.

37.     That only a small number of BOP inmates at Greensville have religious objections to the grooming policy is confirmed by VDOC's grievance reports from that facility, demonstrating that between November 1999 and October 2001, fifteen grievances were filed against the grooming policy for religious reasons.  Even assuming that entries which do not specify a reason for the grievance were based on the inmate's religious beliefs, no more than twenty-one of the grievances at Greensville involved religious beliefs.  In addition, BOP has admitted that this number includes grievances filed by non-BOP inmates.

38.     Likewise, when VDOC screened inmates at Sussex II in response to the *Jackson* injunction, it identified only nineteen out of 1200 District inmates who had sincerely

held religious beliefs that conflicted with the grooming policy. These inmates have already been transferred out of Sussex II. Between March 2000 and October 2001 at Sussex II, eight grievances were filed against the grooming policy which cited religious or spiritual beliefs or practices. Even including grievance report entries that do not specify the reason for the complaint, the total number of grievances at Sussex II that involved religious beliefs during this eighteen month period could not have exceeded twenty-eight.

> **2.** ***BOP's contention that its non-VDOC facilities are unavailable because it cannot determine whether inmates have bona fide religious objections to the grooming policy is unfounded***
>
> > **a.** **BOP's Security Classification and Designation Manual requires BOP to identify religious beliefs and practices of inmates**

39.     BOP designates inmates to institutions pursuant to the policies and procedures set out in its Security Classification and Designation Manual ("Designation Manual"), which has been in effect since 1979. The Designation Manual applies to BOP's decisions to send District inmates to its contract facilities, including VDOC, and to BOP's decisions to transfer inmates out of VDOC. According to the Manual, BOP's placement and transfer procedures provide for two levels of review. The first involves determining the inmate's proper custody or security level. The second involves designation to an appropriate facility and includes consideration of the inmate's programmatic and other individualized needs. Expert witnesses testified at trial that this two-tiered procedure is consistent with sound custody classification and designation practice. Security and safety concerns are properly addressed at the first stage, and religious beliefs are properly considered under the second-stage, individualized consideration.

40.     The plain language of the Designation Manual requires BOP officials to assess each inmate's religious beliefs and practices and take those beliefs into account when deciding whether that inmate should be placed (i.e., designated) in a non-BOP facility. Specifically, the Designation Manual requires:  "When designating a non-federal facility for an inmate, Designators *shall consider the inmate's religious beliefs* as one of the factors in making a designation decision."  Pls.' Ex. 1 at BOP 000064 (emphasis added).  Such a policy clearly contemplates that BOP should assess whether an inmate's sincerely held religious beliefs would be burdened by a particular placement.  *Id.* at BOP 00064 ("If necessary, Designators may consult with Central Office chaplaincy staff in making this designation decision.").

41.     The plain language of the Designation Manual also requires BOP officials to assess each inmate's religious beliefs and practices and take those beliefs into account when making transfer (i.e., redesignation) decisions.  Specifically, the Designation Manual states: "*Religious beliefs will be considered* when designating a non-federal facility for a federal inmate. Ordinarily, a facility that systematically restricts the free exercise of religion will not be designated for that inmate."  *Id.* at BOP 000179 (emphasis added).

42.     By its clear and unambiguous language, therefore, BOP's Designation Manual contemplates that BOP is able to, and indeed "shall" and "will," determine the religious beliefs and practices of its inmates before its designation and redesignation decisions are made. *Id.*  BOP's witnesses admitted that this policy is mandatory.

43.     Nonetheless, BOP witnesses admitted at trial that BOP has not ascertained inmates' religious beliefs and practices and has not taken those beliefs into account when designating BOP inmates to, and redesignating BOP inmates out of, VDOC facilities.

44.     BOP admitted that if information on the religious affiliation of inmates was available, BOP would be required to take that information into account when making designation decisions.[8]   For example, BOP acknowledged that if a judge informed BOP that a newly-sentenced inmate was a Muslim Imam, BOP would take that information into consideration when making the inmate's designation decision.  BOP also admitted that it would be feasible to use religious belief and practice information when it makes designation decisions.

45.     Although there are numerous indicators of inmates' religious affiliation available to BOP, BOP has not tried to ascertain the religious affiliation of the District inmates it designates and redesignates.

**b.      BOP's religious accommodation policy requires BOP to evaluate whether an inmate has a bona fide religious belief**

46.     BOP's policies require BOP to determine whether inmates have bona fide religious beliefs that require specific practices.  For example, BOP requires inmates who seek to participate in religion-based dietary practices to make the request in writing and be subjected to an interview by the prison chaplain.  Based on the interview with the prison chaplain, inmates may be denied certification and thus barred from participation in religion-based food service, and must wait six months before applying again.

47.     Under BOP's policy, an inmate may be removed from his religion-based food service by an institution's Warden or Chaplain if he shows indicia of not following the

---

[8]     Despite admitting that BOP is required under its policies to take inmates' religious beliefs and practices into account when making designation decisions if that information is available, BOP's witnesses also testified that doing so would be contrary to sound correctional practice.  Because these witnesses did not adequately explain how BOP's own written Designation Manual is contrary to sound correctional practice, the Court does not credit the testimony of the BOP witnesses on this subject.

dietary practices of his religion.  After being removed from the religion-based food service program, an inmate must participate in a screening interview with BOP personnel before he may participate again in the program again.

### c. Other prison systems identify inmates with bona fide religious beliefs and practices and accommodate the inmates' religious beliefs

48.     Evidence presented at trial established that it is routine practice for prison systems to determine whether an inmate is a bona fide member of a religious group.  Expert witnesses testified that the purpose of making these determinations is to ascertain whether an individual inmate is entitled to accommodation based on his religious beliefs or practices.

49.     The testimony of adult corrections expert Dr. James Austin[9] established that the state correctional systems in Pennsylvania, Washington, Oregon, and New Mexico have institutionalized processes to determine whether an inmate has a bona fide religious belief or practice.  These states have created committees, comprised of representatives from various divisions within the Department of Corrections, to make determinations on an individual basis as to whether an inmate has a bona fide religious belief or practice.  These committees have successfully handled inmates who seek to manipulate the system and gain advantage by being identified as members of a religious group.

---

[9]     Dr. Austin's testimony was credible and persuasive.  Dr. Austin has worked in the field of adult corrections for more than thirty years.  He has particular expertise in the area of inmate classification and designation, having studied and implemented classification and designation systems for numerous jurisdictions around the country.  Moreover, he has particular expertise with regard to D.C. offenders and their integration into the BOP system, having been retained by Congress on several occasions to work on this issue.  Dr. Austin continues to play an active role in this process, currently working with the D.C. Department of Corrections' Trustees Office, in conjunction with the BOP, to create and implement a security classification system for District inmates.

50.     In addition, VDOC indicated during this litigation that it is able to identify which inmates have bona fide religious objections to its grooming policy.  During the pendency of the injunction in *Jackson*, VDOC informed BOP that it could implement a "methodology" at Greensville to "identify [BOP inmates] with sincerely held religious beliefs."  VDOC also successfully implemented a system to determine which District inmates at Sussex had religious objections to its grooming policy.  BOP has admitted that VDOC is fully capable of identifying which inmates have sincerely held religious objections to the grooming policy.

51.     As a result of the procedure it implemented to comply with the *Jackson* injunction, VDOC identified 19 inmates out of 1,200 at Sussex with bona fide religious objections to its grooming policy.  Those inmates at Sussex who were found to have bona fide religious objections to the grooming policy were "moved to other facilities."  No evidence was presented at trial that these prisoner transfers out of Sussex caused other prisoners to try to manipulate the system in order to receive a transfer out of VDOC, or that these transfers caused other prison administration problems.

> **d.     Bop has successfully implemented screening procedures to identify inmates with bona fide religious objections to the VDOC grooming policy.**

52.     During the pendency of the injunction in *Jackson*, BOP implemented a successful screening process that identified District inmates with religious objections to the VDOC grooming policy and prevented them from being assigned to VDOC institutions.  This process involved BOP personnel interviewing District inmates at BOP holdover facilities about the inmates' religious beliefs.  Inmates identified by this process were placed in non-VDOC

facilities so that their religious beliefs and practices would not be burdened by the VDOC grooming policy.

53.     It took BOP only a few weeks to put this new screening process into place. Although BOP argued at trial that a screening process would cause major problems, including pretextual conversions of inmates subject to potential transfer to VDOC, BOP's witnesses did not identify any substantive problems that arose when such a process was actually implemented during the *Jackson* injunction.[10]   Under questioning from BOP's own attorneys and the court, the only difficulties with the screening procedure that BOP witnesses could identify were that it involved "a little training" for staff and that it was not "fair."  These witnesses also testified, however, that the procedure took only a few weeks to develop and implement, and that once the procedure was in place, BOP had accomplished "what [it] had set out to do."

54.     BOP continues to use holdover facilities, but it no longer uses its holdover facilities to screen District inmates with religious objections to VDOC's grooming policy.  BOP admits that it stopped its screening for religious beliefs only because the *Jackson* injunction was lifted.  While BOP was screening District prisoners and keeping those identified as having religious objections to VDOC's grooming policy at holdover facilities, BOP was continuing to place other District inmates in its own facilities.  Nonetheless, BOP made no effort to find a place at its own facilities for the inmates it identified as having religious objections.

---

[10]     Other prison systems have also implemented religion screening processes without problems.  For example, states have removed groups of inmates from sister-state prisons when the sister-state infringes on a group's religious practice.  Dr. Austin testified that Washington State pulled back Native Americans inmates from Hawaii because Hawaii was not accommodating their religious practice.

55.    After a new inmate is sentenced by the District of Columbia courts, it takes six to eight weeks for the inmate to be transferred from the custody of D.C. Corrections to BOP custody. The vast majority of these inmates are housed in the District of Columbia while this six- to eight-week custody transfer process takes place.  Expert witnesses testified at trial that BOP could perform screening interviews like the ones previously performed at BOP holdover facilities while these inmates are in the District awaiting their custody transfer from D.C. Corrections to BOP.

56.    BOP also successfully screened inmates already at VDOC during the injunction in *Jackson*.  As a result of this process, a handful of Rastafarian and Muslim inmates were identified as having religious objections to the grooming policy and were transferred out of Greensville by BOP.

57.    Despite BOP's claim that such a screening and transfer process would lead to inmates making pretextual conversions in order to qualify for transfer out of VDOC, BOP admitted that to its knowledge no such conversions occurred when it did implement such a process.

> **e.    Objective measures are available to BOP to identify inmates with religious objections to the grooming policy**

58.    There are objective indicators readily available to BOP that would assist it in identifying those of its inmates who have religious beliefs and practices that conflict with the grooming policy.  The contractual agreement between VDOC and BOP grants BOP access to information related to its inmates housed in VDOC, including the list of grievances filed by inmates in Sussex II and Greensville.   These lists, which were produced by BOP as part of this litigation, summarize the basis of each inmate's objection to the grooming policy, and therefore

can be used to determine which inmates may have religion-based objections. BOP also has available to it the actual grievance forms, which contain more detailed information regarding the basis of an inmate's objection to the grooming policy.

59.     BOP is in the process of reviewing the files of its inmates in Sussex II to determine whether they are serving their sentences in the appropriate facility. As part of this process, BOP has discovered that VDOC documents every inmate's participation in religious services and requests for special meals based on religious beliefs. This information would assist BOP in identifying which inmates are members of religious faiths that have prohibitions on cutting hair short or shaving beards.

60.     The religious affiliation of each BOP inmate is also available to BOP through the information gathered by VDOC personnel at the time of intake. All BOP inmates being housed in the VDOC system go through an intake process. During that intake process, VDOC asks each inmate's religious affiliation and records that information.

61.     If an inmate refuses to comply with the grooming policy during the intake process, he is given a disciplinary report and sent to administrative segregation.[11] Thus, in addition to the documents easily available to it, BOP can simply identify inmates in administrative segregation for refusal to comply with the grooming policy and assess whether that refusal is based on a religious objection to the grooming policy.

---

[11]     For example, when named plaintiff Wolfe refused to comply with the grooming policy because of his religious objections, he was placed in administrative segregation at Sussex II from April 9, 2001, until he returned to the District of Columbia for the trial in this action.

62.     Finally, for any inmate who has previously served time in any BOP prison, BOP has that inmate's religious affiliation recorded in its SENTRY [12] computer system. Likewise, any inmate who has served time in any other corrections system, such as D.C. Corrections or the Corrections Corporation of America, has had his religious affiliation information recorded and put in his inmate file. There is nothing preventing BOP from seeking this information from these other prison systems that have incarcerated the inmates who are now in BOP's care.

**f.      BOP routinely determines whether an inmate qualifies for placement in an alternative prison setting in other contexts**

63.     BOP regularly identifies which inmates qualify for alternative prison placements in other contexts. For example, BOP runs a residential drug treatment program (the "program") for its inmates. Because not every BOP facility offers the program, if an inmate qualifies and his institution does not provide the program, he will be transferred to an institution that does offer the program. Under the terms of the program, an inmate who is serving time for a nonviolent crime can obtain a one-year sentence reduction if he successfully completes the program. In order to determine whether an inmate has a substance abuse problem and qualifies for the program, BOP uses a screening process in which it reviews documents about the inmate; interviews family members, former doctors, and members of the community about the inmate; and has a psychologist interview the inmate. As part of this process, BOP successfully separates those inmates who have a bona fide substance abuse problem and who can benefit by transfer to

---

[12]     Throughout the trial, various witnesses talked about BOP's SENTRY system. The trial transcript records each of these references to SENTRY as references to "century."

a facility that provides treatment for their problem from those inmates who do not have a bona fide problem but seek to transfer so that they can reduce their sentences.

64.     Likewise, BOP allows inmates to apply for transfer to a particular BOP institution that offers a food service program so that they can learn to become chefs. In order to determine whether an inmate has a bona fide desire to become a chef, the food service program administrators review an inmate's file and, if necessary, request that the community corrections office for the area where the inmate is housed collect more information on the inmate. If an inmate is approved for participation, he is then transferred to the BOP institution that offers the program.

65.     Trial testimony showed that BOP is willing to transfer inmates in order for them to learn how to cook, but will not transfer inmates whose fundamental religious beliefs and practices are burdened by VDOC's grooming policy:

> Q: Now, if an inmate wants to be transferred because of
> religious convictions that conflict with VDOC's grooming
> policy, what's BOP's procedure for processing that request?
>
> A: I'm not aware of any procedure.
>
> Q: So let me make sure I understand this. If Carl Wolfe,
> sitting over here, wants to learn to cook, there's a procedure
> in place for him to request a transfer to a BOP facility. But
> there's no procedure for him to request a transfer based on
> the fact that he has been in administrative segregation since
> he arrived at Sussex II for the sole reason that his religious
> beliefs prevent him from cutting his hair or shaving his
> face?
>
> A: Correct.

Tr. at 43:6-18.

### g.    Prison systems around the country evaluate whether an inmate has a sincere religious belief or practice

66.    Numerous prison systems around the country are required to assess the bona fides of inmates' religious beliefs as a routine component of inmate requests for special property, special meals, or grooming policy exemptions. *See e.g., Morrison v. Garraghty*, 239 F.3d 648, 652 (4th Cir. 2001) (holding that plaintiff was entitled to sincerity determination in review of his religious property request); *DeHart v. Horn*, 227 F.3d 47, 52 (3d Cir. 2000) (finding that prisons are protected from random requests for special diets by the requirement that the request be "the result of sincerely held religious beliefs"); *Jackson v. Mann*, 196 F.3d 316, 317 (2d Cir. 1999) (stating that kosher meal eligibility in the New York Department of Corrections is based on "a process of interview and review of documentation to substantiate the inmate's Judaic background and intent to strictly observe Jewish dietary law"); *Mosier v. Maynard*, 937 F.2d 1521, 1526-27 (10th Cir. 1991) (reviewing Oklahoma prison's denial of grooming policy exemption where plaintiff challenged adverse sincerity determination); *McElyea v. Babbitt*, 833 F.2d 196, 198-99 (9th Cir. 1987) (remanding for assessment of sincerity of inmate's request for kosher meals at Arizona state prison); *Caldwell v. Caesar*, 150 F. Supp. 2d 50, 53 (D.D.C. 2001) (reviewing alleged denial of access to special meals by D.C. Corrections); *Beerheide v. Suthers*, 82 F. Supp. 2d 1190, 1198-99 (D. Colo. 2000) (reviewing denial by Colorado Department of Corrections of kosher meal request).  VDOC itself assesses the bona fides of inmates' religious beliefs in the context of requests for religioun-based exemptions to property restrictions, *see Morrison*, 239 F.3d at 652, as do the New York, Colorado, and D.C. Departments of Corrections in the context of special meals requests, *see Jackson*, 196 F.3d at 317 (stating that eligibility for New York Department of Correction's kosher diet program requires

substantiation of inmate's "intent to strictly observe Jewish dietary law"); *Caldwell*, 150 F. Supp. 2d at 53 (stating that D.C. Corrections makes special meals available only to those "authorized by the Chaplain to receive a special diet"); *Beerheide*, 82 F. Supp. 2d at 1198-99 (documenting the "effective method by which sincerity of [a Colorado Department of Correction's] inmate's religious beliefs may be tested").

**h.     BOP could implement a screening procedure to identify inmates with bona fide religious objection to the VDOC grooming policy**

67.     BOP could implement a procedure to identify inmates with bona fide religious objections to the VDOC grooming policy.  While the injunction was in effect in *Jackson*, BOP effectively implemented a system that prevented inmates with religious objections from being sent to VDOC and identified and removed inmates from VDOC who had religious beliefs that would be violated by the grooming policy.  Other state systems have also implemented systems that work well in identifying inmates' religious beliefs and practices.

68.     Moreover, with regard to new inmates coming into the system, BOP can have D.C. Corrections identify for it those inmates who have religious objections to the grooming policy.  Dr. Austin, who is working with the D.C. Corrections' Trustee to implement a new classification and designation system for D.C. Corrections by the end of the year, indicated at trial that "it would be no problem for the D.C. Department of Corrections to provide information to the BOP on the religious preference of each inmate who has been sentenced as a felon and is likely now to be designated by the BOP. . ." Tr. at 148:3-12.

69.     It is consistent with sound correctional practice for BOP to implement a procedure to identify and accommodate inmates with religious objections to the VDOC

23

grooming policy because such a procedure would assist in prison population management and reduce recidivism.

### C.   Plaintiffs Seek Relief That Would Be "Narrowly Drawn"

70.    The relief that plaintiffs seek is an order requiring BOP to consider class members' religious beliefs and practices and to house class members in non-VDOC facilities, when such alternative placements are available consistent with an inmate's security level. For the following reasons, such relief would be narrowly drawn:

71.    First, such an order would be  consistent with BOP's own policies regarding consideration and accommodation of inmates' religious beliefs when making placement and transfer decisions involving non-BOP facilities.

72.    Second, BOP takes individual factors into account on a regular basis when deciding the appropriate housing for an inmate.  For example, BOP takes into account judicial recommendations, available programming (e.g., the food service program), and substance abuse problems when making designation and transfer decisions.  BOP has failed to demonstrate that the same could not be done for religion.

73.    Third, BOP and VDOC successfully implemented screening procedures during the pendency of the *Jackson* injunction that would provide the relief that plaintiffs now seek.  BOP has not presented evidence that these screening procedures caused any management problems.

74.    Fourth, BOP is already in the process of reviewing placement of inmates at VDOC's Sussex II facility to make sure that those placements are appropriate and that BOP

inmates are not housed in the "wrong environment." Consistent with its Designation Manual, BOP could take religious beliefs into account as it makes these decisions.

75.   <u>Fifth</u>, it is undisputed that state corrections departments routinely and effectively assess the sincerity of individual inmates' religious beliefs. In addition, prison systems that contract with other states have done what plaintiffs seek here—remove groups of inmates when the sister state holding them under contract infringes on the inmates' religious practice.

## CONCLUSIONS OF LAW

## I.   DEFENDANTS HAVE VIOLATED THE RELIGIOUS FREEDOM RESTORATION ACT[13]

1.   The Religious Freedom Restoration Act ("RFRA") applies to federal officers and agencies like BOP. *Henderson v. Kennedy*, 265 F.3d 1072, 1073 (D.C. Cir. 2001).

2.   BOP is bound by RFRA in discharging its obligations under the 1997 Revitalization Act. *See* 42 U.S.C. § 2000bb-3(b) ("Federal statutory law adopted after November 16, 1993 is subject to [RFRA] unless such law explicitly excludes such application by reference to [RFRA].").

3.   Each BOP decision to place or keep a member of the plaintiff class in a VDOC facility is subject to RFRA scrutiny because RFRA applies "to all Federal . . . law, *and the implementation of that law*, whether statutory or otherwise." 42 U.S.C. § 2000bb-3(a) (emphasis added).

---

[13]   Because our finding that defendants violated RFRA entitles plaintiffs to the injunctive relief they requested, we need not reach plaintiffs' First Amendment claim.

4.      Under RFRA, it is plaintiffs' burden to prove that a government action substantially burdens their sincerely held religious beliefs.  42 U.S.C. § 2000bb-1(a).

5.      Once a substantial burden is established, the government must "demonstrate[ ]" that its action: "(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest."  *Id.* § 2000bb-1(b)(1)-(2) (emphasis added).

6.      RFRA makes clear that "the term 'demonstrates' means meets the burdens of going forward with the evidence and of persuasion."  *Id.* § 2000bb-2(3).

7.      Consistent with the statute, relevant case law confirms that the burden of establishing compelling interest and least restrictive means rests with the government under RFRA.  *Diaz v. Collins*, 114 F.3d 69, 72 (5th Cir. 1997) (holding that the burden of proving the "compelling interest test" is on the government); *Jolly v. Coughlin*, 76 F.3d 468, 477 (2d Cir. 1996) (same); *Cheema v. Thompson*, 67 F.3d 883, 885 (9th Cir. 1995) (holding that the government was wrong in asserting that it did not have the burden to prove no less restrictive alternative was available).  Indeed, the D.C. Circuit has already noted that defendants bear the burden of persuasion on this issue.  *Jackson v. District of Columbia*, 254 F.3d at 271 (D.C. Cir. 2001) ("[T]he district court will need to consider whether BOP . . . can demonstrate that alternative placement in non-Virginia prisons without grooming policies is infeasible.").

## A. Plaintiffs Have Proven That They Have Sincerely Held Religious Beliefs That Are Substantially Burdened by VDOC's Grooming Policy.

8.      A substantial burden on a sincerely held religious belief exists where the government imposes punishment or "denies . . . a benefit because of conduct mandated by

religious belief, thereby putting substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Woods v. Evatt*, 876 F. Supp. 756, 762 (D.S.C. 1995) (quotations and citations omitted).

9.      Defendants have stipulated that "[e]ach of the named plaintiffs has sincerely held religious beliefs that prohibit them from shaving or cutting their hair, and that conflict with VDOC's grooming policy." Stipulations of Fact, at ¶ 3 (Oct. 27, 2001).

10.      This court has held that plaintiff Wolfe has sincerely held religious beliefs that prohibit him from cutting his hair and shaving his face. *Jackson*, 89 F. Supp. 2d at 65 (finding Wolfe's testimony to be "heartfelt and sincere").

11.      This court has held that subjecting plaintiffs to the grooming policy substantially burdens their sincere religious beliefs. *Id.*, 89 F. Supp. 2d at 65 (finding that the grooming policy "imposes at least a substantial burden if not more").

12.      The burden on plaintiffs' beliefs has increased since the court's ruling in the *Jackson* case. At the time of the *Jackson* decision, VDOC's policy gave the named plaintiffs a "choice" between cutting their hair and shaving their beards *or* being placed in administrative segregation and losing all privileges. Here, it is undisputed that if plaintiffs are returned to VDOC facilities, they will be forced to cut their hair and shave their beards *in addition* to being sent to administrative segregation for failure to voluntarily comply with the grooming policy.

### B. Defendants Have Failed to Meet Their Burden of Proving That There Is No Less Restrictive Alternative.

13.      Because plaintiffs have demonstrated that the VDOC grooming policy substantially burdens their sincerely held religious beliefs, the burden shifts to defendants to prove that subjecting plaintiffs to the grooming policy is the least restrictive means of achieving a

compelling interest. *See* 42 U.S.C. § 2000bb-1(b)(2); *Diaz*, 114 F.3d at 72; *Jolly*, 76 F.3d at 477-78; *Cheema*, 67 F.3d at 885.  BOP has failed to carry this burden.

      14.    As a less restrictive alternative, BOP could house plaintiffs in any of the many institutions run by BOP or its non-VDOC contractors that do not impose a substantial burden on plaintiffs' religious beliefs and practices.

      15.    Defendants assert two arguments to justify their failure to house plaintiffs in facilities that would not burden their religious beliefs and practices: 1) BOP's prisons are overcrowded and thus it has nowhere to house plaintiffs; and 2) BOP cannot identify class members because BOP cannot assess the bona fides of an inmate's religious beliefs.  Neither of these arguments is persuasive.

      16.    Defendants have failed to demonstrate that BOP's interest in managing overcrowding would be affected in any way by plaintiffs' request that BOP take their sincere religious objections to the grooming policy into account in making placement and transfer decisions.  BOP's capacity concerns are not implicated by individualized designations and redesignations to non-VDOC facilities for class members, because BOP's inmate population is already in constant flow around the country, the number of individuals involved is relatively small, VDOC facilities are virtually full, BOP already places two of every three District inmates in a non-VDOC facility, BOP will easily refill spaces vacated at VDOC facilities, and the overall number of individuals in the BOP system will not be affected.  Although BOP undoubtedly has an important interest in managing overcrowding, that interest will not be harmed by the relief plaintiffs seek and therefore cannot justify BOP's practice of burdening plaintiffs' sincere religious beliefs.

17.     Congress specifically warned that the judicial deference owed to prison administrators under RFRA does not allow either the administrators or the courts to rely on conclusory arguments. S. Rep. No. 103-111, at 10 (1993), *reprinted in* 1993 U.S.C.C.A.N. 1892, 1899 ("[T]he state must do more than simply offer conclusory statements that a limitation on religious freedom is required for security, health or safety"); *see also Jolly*, 76 F.3d at 479 (2nd Cir. 1996) (finding that prison regulations are "not insulated from scrutiny merely because the defendants brandish the concepts of public health and safety"). To prove that no less restrictive alternative exists, defendants must show that the alternatives proposed by plaintiffs will not protect BOP's interest in prison security. They have failed to make this showing.

18.     BOP also argues that no less restrictive alternative is available because it is not permissible or proper for the government to inquire into the sincerity of inmates' religious beliefs, and therefore BOP cannot determine who would qualify for alternative placement. This argument fails both as a matter of fact and as a matter of law.

19.     The Supreme Court has made clear that governmental agencies not only can assess bona fides when deciding whether to accommodate religious beliefs, but often must do so in order to properly assess religious accommodation claims. *See United States v. Seeger*, 380 U.S. 163, 184-85 (1965) ("Local [military draft] boards and courts in this sense are not free to reject beliefs because they consider them 'incomprehensible.' Their task is to decide whether the beliefs professed by a registrant are sincerely held and whether they are, in his own scheme of things, religious. But we hasten to emphasize that while the 'truth' of a belief is not open to question, there remains the significant question whether it is 'truly held.' This is the threshold question of sincerity which must be resolved in every case."); *accord U.S. v. Ward*, 989 F.2d

1015, 1018 (9th Cir. 1992); *Hager v. Secretary of Air Force*, 938 F.2d 1449, 1454 (1st Cir.

1991); *Philbrook v. Ansonia Bd. of Educ.*, 757 F.2d 476, 482 (2d Cir. 1985) ("[A] sincerity

analysis is necessary in order to differentiat[e] between those beliefs that are held as a matter of

conscience and those that are animated by motives of deception and fraud.") (internal quotation

marks omitted); *Patrick v. LeFevre*, 745 F.2d 153, 157 (2d Cir. 1983); *U.S. v. Joyce*, 437 F.2d

740, 744 (7th Cir. 1971); *Lindenberg v. United States Dep't of Justice*, 657 F. Supp. 154, 161-62

(D.D.C. 1987) (reviewing INS determination of inadequate "religious commitment" for purposes

of special visa certification).

      20.    Prison officials in other systems can and do assess the sincerity of inmates'

religious beliefs in order to administer prison programs and policies ranging from requests for

exceptions to grooming policies or personal property rules to approval for special meals. *See*

*e.g., Morrison*, 239 F.3d at 658 (4th Cir. 2001) (finding that plaintiff was denied equal protection

because defendants "never evaluated the sincerity of [plaintiff's] beliefs" as they would have for

other inmates' requests for religious items); *DeHart*, 227 F.3d at 52 n.3 (3d Cir. 2000) ("Prison

officials are, of course, entitled both to make a judgment about the sincerity of an inmate's belief

when he or she asks for different treatment and to act in accordance with that judgment.");

*Mosier*, 937 F.2d at 1523, 1526 (10th Cir. 1991) (holding, in the context of a request for a

grooming policy exemption, that "[w]ithout question, the prison may determine whether

plaintiff's beliefs are sincere, meaning whether they are truly held and religious in nature");

*McElyea*, 833 F.2d at 199 (9th Cir. 1987) (holding that "[i]t is appropriate for prison authorities

to deny a special diet if an inmate is not sincere in his religious beliefs"); *see also Makin v. Colo.*

*Dep't of Corrections*, 183 F.3d 1205, 1213 (10th Cir. 1999) (relying on *Seeger*, 380 U.S. at 184-

85 (1965), for validity of assessing sincerity of belief for special meals request); *Brock v. Carroll*, 107 F.3d 241, 244 (4th Cir. 1997) (Wilkins, J. concurring) (stating that request for exception to "contraband" rule should be analyzed under *Seeger* standard); *Jackson v. Mann*, 196 F.3d at 320 (2d Cir. 1999) (reviewing "through the prism of sincerity" defendants' motion to dismiss plaintiff's challenge to denial of kosher meal request).

21.     Therefore, the court concludes that BOP officials not only are permitted to assess bona fides but are required to do so where defendants' actions impose a substantial burden on plaintiffs' sincere religious beliefs regarding hair and beards.

22.     Moreover, the government cannot meet its burden to prove least restrictive means unless it has actually considered and rejected the efficacy of less restrictive measures before adopting the challenged practice. *See e.g., United States v. Playboy Entertainment Group, Inc.*, 529 U.S. 803, 824 (2000) (finding, in the context of a First Amendment challenge to speech restrictions, that "[a] court should not assume a plausible, less restrictive alternative would be ineffective"); *City of Richmond v. J.A. Croson*, 488 U.S. 469, 507 (1989) (finding city's minority set-aside program was not narrowly tailored in part because the city had not considered whether race-neutral measures would have achieved the government's interest); *Hunter ex rel. Brandt v. Regents of Univ. of Calif.*, 190 F.3d 1061, 1078 (9th Cir. 1999) (finding that government "neglected to undertake any consideration—let alone serious, good faith consideration" of race-neutral alternatives) (internal quotation marks and citation omitted).  Thus, the government cannot meet its burden by relying on post-hoc excuses for continuing to burden individuals' religious beliefs. *Jolly*, 76 F. 3d at 479 (finding that "post hoc rationalizations will not suffice to meet [RFRA's] requirements") (citations omitted).  Here, BOP concedes that it never considered

31

the less restrictive alternative of assigning inmates with religious objections to the VDOC

grooming policy to BOP or other non-VDOC facilities, despite the fact that BOP successfully

implemented this alternative in response to this Court's injunction in *Jackson*, an alternative

which it discontinued only because the injunction was lifted.

        23.     The court concludes that BOP has available to it a less restrictive

alternative to subjecting inmates with religious objections to the VDOC grooming policy. That

alternative consists of taking inmates' religious beliefs into consideration as part of the

designation or redesignation process, as BOP's own Designation Manual requires.

        24.     As instructed by the D.C. Circuit, the court has considered whether

"alternative placement in non-Virginia prisons without grooming policies" is feasible, and finds

that it is. *Jackson*, 254 F.3d at 271. The court therefore concludes that defendants have failed to

meet their burden of proving that less restrictive means are not available. *See Cheema*, 67 F.3d

at 885 (defendants' failure to offer evidence that a less restrictive alternative was not available

required entry of an injunction in favor of plaintiffs asserting RFRA claim).

## CONCLUSION

        For the foregoing reasons, Judgment is entered in favor of plaintiffs and

defendants are permanently enjoined from violating plaintiffs rights under RFRA. An appropriate

order accompanies this memorandum.

Henry H. Kennedy, Jr.
United States District Judge

Date: 2/15/02